UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THE DOW CHEMICAL COMPANY, and
DOW QUIMICA MEXICANA, S.A. DE C.V.

      Plaintiffs and Counter-Defendants,

                                    Case No. 04-10275-BC

v.                                   Honorable David M.  Lawson

GENERAL ELECTRIC COMPANY,
GENERAL ELECTRIC CONSUMER &
INDUSTRIAL, and CONTROLADORA
MABE, S.A. DE C.V.,

        Defendants,

and

GENERAL ELECTRIC COMPANY, and
CONTROLADORA MABE, S.A. DE C.V.,

          Counter-Plaintiffs.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The plaintiffs and counter-defendants, Dow Chemical Company and its Mexican affiliate Dow Quimica Mexicana S.A. de C.V. (collectively Dow), produce chemical products including certain polyurethane raw materials. The defendants and counter-plaintiffs, General Electric Company, General Electric Consumer and Industrial, Controladora Mabe S.A. de C.V., a Mexican affiliate of General Electric (collectively GE), manufacture refrigerators and use raw polyurethane to make insulation and support foam for the refrigeration units they manufacture. The parties entered into negotiations for an agreement for Dow to become the exclusive supplier of its polyurethane materials to five GE manufacturing plants located in the United States and Mexico

based on a fixed priced model.  A final agreement was never reduced to writing and signed by the authorized parties, and a dispute now exists whether a contract was formed at all.

On October 7, 2004, Dow filed a complaint requesting that the Court declare that no enforceable agreement exists for the sale of certain polyurethane materials in 2004, 2005, and 2006 and that it is no longer obligated to sell those materials to GE.  Dow also seeks to levy additional charges for the product it delivered after January 1, 2004.  Thereafter, GE filed an answer, a statement of affirmative defenses, and a counter-claim seeking a declaration that an enforceable agreement exists, Dow breached that agreement, and GE is entitled to rebates under the terms of the agreement.  In an amended counter-claim, GE has alleged in addition that Dow committed fraud by delivering a different product than it represented.

The Court bifurcated the proceedings and gave the parties (at their request) an expedited discovery schedule as to the liability aspect of the case.  Presently before the Court are the parties' cross-motions for partial summary judgment.  In its motion, Dow argues that although the parties engaged in negotiations over the course of ten months, no contract ever emerged because it was unwilling to be bound absent a signed agreement and the emails containing various draft proposals never reflected a consensus on the material terms.  Dow also insists that an enforceable agreement cannot be found under the circumstances because the applicable statute of frauds has not been met. GE asserts that a signed writing is not necessary to give rise to an enforceable agreement even among parties as sophisticated as Dow and GE, an agreement was reached at a meeting on October 15, 2003 and the material terms of the agreement are reflected in an October 20, 2003 email, and Dow's course of conduct in conformance with that email proves that a contract in fact emerged.  GE alternatively argues that it is entitled to relief by operation of the doctrines of promissory and

equitable estoppel and that Dow's emails can be seen as an invitation to enter into a unilateral contract, which GE accepted through performance. The parties have filed responses in opposition to the respective motions, and the Court heard oral argument on August 1, 2005.

The Court now finds that Dow's statute of frauds claim is unavailing, as are GE's claims of equitable and promissory estoppel, and contract formation based on a unilateral contract theory. The Court is also satisfied that the undisputed evidence establishes no written contract between the parties. However, the evidence also shows that Dow engaged in performance that was consistent with the existence of an agreement according to terms discussed by the parties. That conduct gives rise to competing inferences concerning contractual intent that preclude summary judgment for either party on the issue of liability. The Court, therefore, will grant in part and deny in part the cross-motions for summary judgment and set the matter for trial on the factual issues that remain.

## I.

Because the facts are complicated and drive the ultimate determination of the pending motions, the Court will recount them in some detail. The parties have a commercial history with each other, and the events in this case are properly viewed against this background. Before the negotiations in this case commenced, Dow had agreed to supply MDI and polyol – polyurethane raw materials – to three GE refrigerator manufacturing plants. Dow began selling those materials to GE in May 2002, and in October 2002 signed a letter agreement, which became effective May 1, 2002, that covered one hundred percent of GE's requirements at its facilities in Decatur, Illinois, Louisville, Kentucky, and Celaya, Mexico for PAPI 6146, XUS 15639 polyol and DSD 296.01 polyol, trade names for polyurethane raw materials, until December 31, 2004. The agreement specified:

> When signed by the parties, this "Letter Agreement" between the Dow Chemical Company, a Delaware corporation and Dow Quimica Mexicana . . . as sellers and General Electric Company . . . acting through its GE Appliances business component (GEA) and Controladora Mabe . . . as buyers shall become the controlling agreement of the parties with respect to purchase by GEA and Mabe of PAPA 6146, XUS 15639 polyol and DSD 296.01 polyol, which are polyurethane raw materials manufactured and sold by Dow and which are further defined below in the Current Price List (the "products")
>
> Effective May 1, 2002, and in exchange for the following pricing, Dow will sell and GEA and Mabe will purchase their requirements for the Products for GEA's Decatur and Louisville plants and Mabe's Celaya plant. This Letter Agreement shall remain in effect through December 31, 2004 and may only be extended by the written agreement of all parties.

Pl.'s Mot. Summ. J. Ex. 1, Letter Agreement. Dow further promised to provide PAPI 6146 at a price of $ .69 per pound to GE's Decatur and Louisville locations and $ .715 per pound to the Celaya plant. *Ibid.* Dow also agreed to sell XUS 15639 at a rate of $ .61 per pound to GE's Decatur and Louisville plants. *Ibid.* The Celaya plant would receive DSD 296.01 for $ .63 per pound.

The also agreement provided for rebates should the volume of products sold attain certain levels:

> Dow will pay a volume rebate on all pounds sold under this Agreement on a calendar year basis if all combined GEA and Mabe Shipments under this Agreement reach certain volume levels. If total shipments exceed 55 million pounds in any calendar year, Dow will pay a $.01 per pound volume rebate on all pounds shipped during that calendar year. If total shipments exceed 70 million pounds in any calendar year, Dow will pay a $.02 per pound volume rebate on all pounds shipped during that calendar year. All rebates will be paid in the form of a credit memo good for the purchase of Dow polyurethane Products. The credit memos will be issued within 45 days after the end of a calendar year and will be issued to the GEA or Mabe entity located in the country where the Product was shipped. All credit memos will expire within one year from the date of issuance.

*Ibid.* The agreement also expressed Dow's desire to expand its sales to other GE facilities, specifically seeking to "obtain business at GEA's Bloomington, In and Mabe's Queretaro, Mexico plant." *Ibid.* At the time, "Dow offer[ed] the same pricing for Bloomington as Louisville" assuming

-4-

that GE wanted the same products. *Ibid.* Otherwise, Dow promised to "continue to work with GEA and Mabe on productivity improvement projects and help GEA and Mabe reach the 5 percent annual cost improvement goal." *Ibid.* The agreement was signed by Dow's commercial director, Dow Quimica's commercial manager, a contracting agent for GE, and the sourcing leader at Mabe.

The negotiations surrounding the signing of the letter agreement evidenced a desire of the parties to proceed only by written agreement with appropriate management approval. Kenneth Ashley, a GE sourcing agent and GE's corporate designee, testified at his deposition:

> Q.   And were you given the charge by Mr. Ramirez or someone else that one of your objectives in 2002 was to sign a global agreement with Dow?
> A.   This was one of our initiatives to do, the team's initiatives to do was to reach some type of agreement with Dow, yes, understanding that we have had a good relationship with Dow. We saw them as one of our players that was moving forward in the future, and I think it was based on the relationship with Dow.
> Q.   Actually the objective, sir, does not say to reach a global agreement with Dow.
> A.   No.
> Q.   It says to sign a global agreement with Dow; correct?
> A.   To close the deal. That's what it says here is to close the deal.
> Q.   And you would equate the word sign with the concept of closing the deal; correct?
> A.   Correct.

Pl.'s Mot. Summ. J., Ashley dep. at 224-25. According to Dow, a signed, written agreement was so important to GE that its sourcing manager, Lionel Ramirez, was prepared to fly to Houston "to sign the deal" himself. Pl.'s Mot. Summ. J., Ramirez dep. at 169. In fact, it was GE who ultimately inserted the phrase at the beginning of the letter agreement stating that the agreement would only become effective upon the signature of the respective parties. GE also insisted that the agreement contain the provision that it could be modified only "by the written agreement of all parties." Ramirez dep. at 206. Finally, GE sought to be the last party to sign the agreement apparently to

-5-

"ensure that there aren't going to be any other changes before [it] actually puts [its] signature" on the document. *Ibid.*

Similarly, Dow had its own idiosyncracies in the contracting process. Dow employs a standard sales contract approval form that includes a formal routing procedure for obtaining management approval. *See* Pl.'s Mot. Summ. J. Ex. 6, Standard Sales Contract Approval Form. The level of approval required for a proposed agreement depends on several factors including the duration, the dollar value, the use of non-standard terms and conditions, and whether a price commitment exceeding one year is contemplated. A contract could require approval by the product manager, market manager, legal department, business manager, and vice president. In addition, if changes are made to a contract after it has been approved, the process begins again. Pl.'s Mot. Summ. J., Beitel dep. at 84.

Les King, a Dow sales representative, informed GE of Dow's approval procedures during the negotiations of the letter agreement. Both the dollar value and the terms of the letter agreement meant that Dow's product manager, legal department, commercial director, business director, and vice president all had to sign off on the contract. Because King was unable to approve the contract himself as a sale representative, GE insisted that King have appropriate managers on the line during conference calls when negotiating. In addition, if GE proposed a change in a draft of the letter agreement, it asked King to review the changes with Dow management. GE and Dow exchanged several drafts, and Dow gave final approval on August 17, 2002. GE had the sourcing managers of each company sign off on the agreement along with the legal department before it signed the agreement on October 7, 2002. Although the agreement was signed by the last party in October of

2002, Dow apparently began supplying GE with polyurethane in May 2002, the date specified in the letter agreement.

In September of 2003, the parties entered into negotiations for Dow to supply 100 percent of polyurethane  raw materials to GE's plant in Bloomington, Indiana and Mabe's Queretaro, Mexico facility in addition to Decatur, Louisville, and Celaya, Mexico operations already covered by the letter agreement.  GE claims that these negotiations resulted in a new contract for the supply of materials to all five of its plants.  Dow, on the other hand, insists that parties' never reached final agreement on a new contract.

At the outset of negotiations, Dow was aware that in order to secure a new contract, it would have to offer competitive pricing.  Def.'s Mot.  Summ. J. Ex. 5, Email (Oct. 8, 2003).  Dow understood that GE's goal was to obtain an agreement in which the price of polyol remained firm for 2004 and increased by no more than six percent for 2005.  *Ibid.*  In other words, GE was seeking to smooth production costs over a one-year period.  Further, Dow understood GE to want an agreement for three years – 2004, 2005, and 2006.  *Ibid.*  The ostensible reason for the term of the contract was to guard against reaction from competing suppliers; GE "would be putting all of their marbles with Dow and piss off the competition." *Ibid.*

Dow believed  a single, written, signed agreement was required as was the case with the first letter agreement.  King recalled his initial discussions with Beth Vance, a GE sourcing manager, with respect to a new contract as follows:

> Q.    Tell me, to the best of recollection -- I want to focus first on the September 8 call with G.E. Tell me, to the best of your recollection, what was discussed during the September 8 call.
> A.    Okay. Miss Vance asked us to put together some proposals that would incorporate as the status quo, the status quo plus adding Queretaro and the status quo adding Queretaro and Bloomington, to add those on there, to come

> back with -- to them with some kind of a proposal that we could look forward
> to. And this was the first time I guess I can recall having some discussions
> that we would try to see if we could put together a draft to a letter of
> agreement or contract as we would move forward to incorporate the other
> two facilities, because the current one we were operating under did not
> include Queretaro and Bloomington.

Pl.'s Mot. Summ. J. Ex., King dep. at 111.  King further testified at his deposition:

> Q.    During the discussions you had in September and October of 2003, was it
>       your intent to have a written letter agreement signed by all the parties that
>       would govern sales at Queretaro and Bloomington, as well as the other G.E.
>       plants?
> A.    Yes.
> Q.    And did G.E. ever tell you during the course of your discussions in
>       September or October that they did not want to have a letter agreement
>       signed by the parties?
> A.    No.
> Q.    Did they ever tell you that at any point after October of 2003?
> A.    No.

*Id.* at 265.

Although Dow had established procedures and generally operated by written agreement, at

times it operated without a formal writing.  Les King testified that with certain companies Dow

transacted on the basis of purchase orders in varying volumes:

> Q.    Did you have any customers who – with whom you did not have a letter
>       agreement or some other type of written agreement, but who operated only
>       on a purchase order basis?
> A.    During what time period?
> Q.    Let's talk about the 2002 to the present time period.
> A.    Yes.
>       . . .
> Q.    Do you know what kinds of volumes you sell to Polythane on an annual
>       basis?
> A.    Very insignificant. I think last year we might have sold them – in '04 maybe
>       less than – less than 100,000 pounds.
> Q.    What about with Polyfoam?
> A.    Same thing. . . .
> Q.    Any other customers with whom you operate on a purchase order basis . . ?
> A.    Without a purchase order or without a legal agreement?

Q.    No, with just a purchase order?

A.    Oh, yes. Yes. Today in '05 we're operating that way with Foam Supplies. The contract we had with them expired, so it's strictly on a purchase order basis with them. And the same with Foam Enterprises.

Q.    What are the volumes with Foam Supplies?

A.    . . . I'm going to estimate somewhere close to 8-10 million pounds.

Q.    What about Foam Enterprises?

A.    For '05 it will probably be 2 million pounds.

Def.'s Resp. Br. Ex. 4, King dep. at 73-75.

In this case, GE also expressed a desire to proceed by written agreement. Donald Willian,

GE's team leader in charge of supervising the negotiations, stated:

Q.    Did you understand from your conference calls and from this exchange of E-mails that the parties were going to try to enter into a signed written agreement?

A.    It was my understanding we were going to work together to try to come to an agreement.

Q.    Okay. Do you know, was it your understanding that they – that you would work towards a written agreement?

A.    Work towards, yes.

Q.    And was your understanding on September 11th; correct?

A.    Well, at this point we didn't know whether we were going to get to an agreement or not.

Q.    I understand that. But you knew that you – your understanding was that you would work towards a written agreement; correct?

A.    Correct.

Q.    Was that something that you wanted, a written agreement between the parties?

A.    That we wanted, yes.

Q.    Why did you want that?

A.    As, as – well, both parties wanted it. It's always good to have a written, signed document.

Q.    And when you were mentioning that both parties wanted a written agreement, you are referring to a signed written agreement; correct?

A.    Yes.

Pl.'s Mot. Summ. J., Willian dep. at 120-21.

A signed, written agreement never resulted, Dow claims, because the parties were never able

to agree on all of the critical terms. Among the critical terms was the quality of polyol that Dow

-9-

shipped to GE.  In April 2003, GE discovered that the polyol was not uniform across shipments.

Kenneth Davis, a GE engineer, testified at his deposition:

> Q.    What does the term polyol variability mean to you?
> A.    It means that in the polyol that we purchased from Dow, there is variability.
> Q.    In August, 2003, did the Dow formulation at that time have a polyol variability problem?
> A.    The polyol we were receiving at that particular – as part of that formulation was having a variability problem issue.
> Q.    Can we refer to that problem here as a polyol variability problem?
> A.    Yes, we can.

Pl.'s Mot. Summ. J., Davis dep. at 113-14.  Variability, Davis explained, meant increased production

costs for GE:

> Q.    Did the polyol variability problem cause some difficulties in the production process at the GE Decatur plant back in 2003?
> A.    Yes, it did.
> Q.    Pardon?
> A.    Yes, it did.
> Q.    What problems did it cause?
> A.    The inconsistencies in minimum fill caused higher – high internal failure costs which required Decatur to add more foam to the refrigerator to fill it, therefore adding cost.

*Id.* at 116.

Consequently, GE was unwilling to let Dow supply its Bloomington facility until the product

variability issue had been resolved.   Vance explained the role of polyol variability in the

negotiations:

> Q.    Fair enough. In your negotiations with Dow, was this variability problem something that found its way into those negotiations?
> A.    Yes, because it had to be fixed before we  could implement Bloomington.
> Q.    And was this something that if it had not been fixed, then would GE have used Dow product at Bloomington?
> A.    We weren't allowed to put Dow into production at Bloomington until their polyol variability issue was resolved.

-10-

Vance dep. at 132. Steve Merry, a foam engineer with GE, reiterated the company's unwillingness to sign an agreement absent a resolution of the variability problem. He agreed that "at least as of February of 2004, . . . GE did not want to commit itself to use Dow polyol at the Bloomington plant until and unless the polyol variability issue was fixed . . . ." Pl.'s Mot. Summ. J., Merry dep. at 49. Ramirez also noted that he could recall no situation in which GE contracted with a supplier before its products had passed GE's qualifications. Ramirez dep. at 110.

According to King, GE would not convert its Bloomington plant to Dow's products unless the problem was fixed. King also stated that the variability issue was so bad that in December 2003, GE threatened to end its existing relationship with Dow at the Decatur plant. Not only was GE disappointed with Dow's quality, it was courting "Huntsman material into Decatur and [GE] might go ahead and get that qualification done and our business at Decatur was at [sic] jeopardy because of these performance problems and the variability problem." King dep. at 269.

The product variability issue, Dow claims, overshadowed agreement on other critical terms such as price and quantity. Dow sought to condition up front price, quantity, and rebate amounts at all five of GE's operations on the conversion of the Bloomington facility despite any issues over polyol variability. On September 11, 2003, Dow sent an initial proposal to GE in an email authored by Les King to Beth Vance and Jose Luis Lopez of Mabe. The proposal stated:

> Based on our phone conversation of September 8th, we would like to present you with our pricing agreement as you outlined. Beth asked for pricing for status quo, status quo plus one plant (Queretaro), status quo plus two plants (Queretaro and Bloomington).

1.  Status quo- MDI- Celaya, DPO[1] & LPO[2] $.73/lb; Polyol- Celaya $.655/lb, DPO & LPO $.64/lb volume rebate remains in effect and no firm pricing for 2004.

2.  Status quo plus Queretaro- MDI- Celaya, Queretaro, DPO & LPO $.73/lb; Polyol - Celya $.645/lb Queretaro $.77/lb, DPO & LPO $.64/lb
volume rebate should be $.01/lb on all pounds and pricing is firm through Dec 2004

3.  Status quo plus Queretaro & BPO[3]- MDI all locations $.725/lb; Polyol- Celaya $.63/lb, Queretaro $.76/lb, DPO, LPO & BPO $.615/lb
volume rebate should be $.02/lb on all pounds and pricing is firm through Dec 2004.

The volume rebate is per our signed Letter Agreement of $.01/lb if shipment exceed 55MM lbs during calendar year and $.02/lb if exceed 70 MM lbs during calendar year.  This pricing agreement is based on the assumption that Dow will pass qualification at Queretaro and Bloomington and resolve the polyol variability issue in the US.  In addition, we ask for Mabe written confirmation of 100 % supply position in Mexico and written evidence of competitive firm pricing for 2004 in US.

Pl.'s Mot.  Summ.  J.  Ex. 20,  Email (Sept. 11, 2003).

On September 22, 2003, Beth Vance responded and suggested that the negotiations should focus on the third option.  *Ibid.*  She also proposed the following changes:

1.  We need this to be a two year fixed price (2004&2005) with an optional third year extension with a price adjustment of no more thana [sic] $0.015/lb increase for the year

2.  Dow's guarantee to supply/support Colombia and Carnco at the same base price if GE requests this

3.  $0.02/lb rebate per year for all plants for switching BPO and Queretaro over (not tied to a specific volume number)

4.  Fix incoming polyol variability by 10/31/03.  Dow must prove they have identified the root cause of incoming issue and demonstrate proven quality over a

---

[1]Decatur Plant Operations

[2]Louisville Plant Operations

[3]Bloomington Plant Operations

-12-

period of time (time specified per GECP[4]). Dow must also prove they are capable of producing an acceptable quality at double the current volume. Once this is proven (per GECP's okay) we will switch BPO operations over. However, if the issue is not resolved by 10/31/03 GECP still gets option 3 pricing effective 1/1/04 and the $0.02 rebate for 2004 and 2005. GECP will continue to work with Dow on the issue until we can get it fixed and put Dow into production at BPO (if we miss the Christmas 2003 shutdown the next available window would be summer shutdown 2004).

5. Dow commitment for the retroactivity project at Celaya

6. 1.8 % average 18 day/net average 90 day payterms

7. Dow support on the 245fa conversion at Queretaro (if Queretaro needs to change)

*Ibid.*

On October 15, 2003, the parties met to discuss the terms. GE now contends that an oral agreement was reached at this meeting and that it is enforceable even if no writing ultimately was signed by the parties. After the meeting, Dow drafted an outline proposal and sent it to GE for its review. The outline, dated October 20, 2003, provided:

Below is our understanding of pricing and conditions we agreed on new 100% supply position with GE/Mabe during our Oct 15 meeting. Please let me know if you have differences.

Three year agreement through 12/31/06 with firm pricing for 2004 and a 6% price cap for 2005, with half of the price increase being implemented 1/1/05 and the other half on 4/1/05. We would start discussion to reach consensus by 9/1/05 for 2006 pricing. Dow would become 100% supplier to DPO, LPO, BPO, Celaya, and Queretaro. Queretaro conversion during Nov/Dec 2003 and BPO by 8/15/04.

New pricing effective 1/1/04 of $ .725/lb for MDI; $ .615/lb for polyol at DPO, LPO, & BPO; $ .63 for Celaya and $ .76 for Queretaro. Celaya and Queretaro pricing effective date of Queretaro conversion. If BPO conversion delayed beyond 8/15/04, then revert back to DPO & LPO pricing of 10/15/03 and this agreement would reopen to new negotiations. Current rebate agreement extended to include 2006 with additional rebate level of $ .0125/lb for minimum of 62 MM pounds for 2004.

---

[4]General Electric Consumer Products

-13-

Mabe to immediately start qualification process for Columbia and Brazil with 0/31/04 [sic] target to be well underway in the qualification process. Camco supply/support included and all three locations would be included in the rebate when they covert to Dow.

Celaya reactivity project cost to be split in half for Dow with understanding Celaya will examine and determine if current estimate of $80 M can be lowered. Dow support fro [sic] Queretaro.

Current cash terms remain.

Mabe to provide 100% commitment letter and GE to provide competitive firm pricing for 2004 letter.

Dow to resolve polyol variability issue currently under test at DPO.

I will draft a new letter agreement once I have agreement from everyone as to the above outline we agreed to on Oct 15th.

Pl.'s Mot. Summ. J. Ex. 24, Email (Oct. 20, 2003). King sent the outline by email, and in the subject

line he wrote "agreement." King explained his thoughts at the time:

> Q. Exhibit Four is an email from you to Beth Vance and others dated October 20, 2003?
> A. Correct.
> Q. And is it fair to say that Exhibit 4 is the final version of the draft e-mail that we identified as Exhibit 5?
> A. It is a version of it. I'm assuming it is the final one, yes.
> Q. It's the version that you, in fact, sent to G.E.?
> A. It is the version I sent to G.E., so yes.
> Q. Now after you sent the draft, Exhibit 5, to your colleagues, Andres Hernadez, Chuck Reardon, Eduardo Simoniello, and Rick Beitel, did any of those gentlemen contact you and tell you that you should not use the word "agreement" in the subject line?
> A. No.
> Q. Did any of those gentlemen contact you and tell you that you should not use the words 'below is our understanding of prices and conditions we agreed on new 100 percent supply position to G.E. Mabe'?
> A. I don't think so.
> Q. Did any of those individuals contact you and indicate that they did not believe there was an agreement during the October 15, 2003, meeting?
> A. I don't recall contacting me.

-14-

Def.'s Resp. Br. Ex. 4, King dep. at 167-68.

Internally, Dow felt that an agreement had been reached.  On October 16, 2003, Charles Reardon, a member of Dow's negotiating team who accompanied King, sent an email to Stephanie Barbour.  He wrote:

> We had our meeting with GE yesterday.  We lost all of the business.
>
> Just kidding.  Thought that you might need some excitement over vacation.  We finalized the deal for 2004 and 2005.  We will be receiving 100% of GE's business in these two years.  Queretaro will convert 100% by Dec 1 and Bloomington will convert by summer with the intent to push it up as soon as possible.  We will have a clause in the agreement that negates the entire agreement if Bloomington does not covert by summer.  I will send out an e-mail later today of [sic] Friday with all of the details, but I wanted you to be aware of where we stood.  We gave on some issues and they gave on some issues.  It is a good deal for us and will be a good deal next year.  We will get 30 MM lbs of business in appliance and get some much needed stability.

Def.'s Resp. Br. Ex. 8, Email (October 16, 2003).  Barbour responded,

> WELL DONE!!!! GE is one of the toughest negotiators I have ever dealt with.  You have to have enormous confidence and a well thought out strategy to succeed when you negotiate with them . . . you had both and you did it.  Congratulations. . . I am incredibly proud of what you have done and selfishly thrilled to see this on our bottom line.

*Ibid.*

On October 24, 2003, Beth Vance replied to Les King about the outline.  She informed him "that we agree with understanding that the 6% price cap for 2005 is price up or price down."  Pl.'s Mot. Summ. J. Ex. 25, Email (Oct. 24, 2003).  However, "if one of the parties feels a price increase or decrease is justified in 2005, they must bring the data that supports the increase or decrease . . . and negotiate with the other party on what the justified increase/decrease should be percentage wise." *Ibid.*  Vance stated the rebate proposal was satisfactory, that the qualification process would be started for Columbia and Brazil by the first quarter in 2004, and Mabe "must first have a clear

-15-

understanding of the technical implications and resources involved, and also remember that qualification does not guarantee conversion." *Ibid.* Finally, Vance wrote "Dow to resolve polyol variability issue to GECP's okay and any other quality or delivery issue that occurs at least three months before the implementation of BPO. If issue is not resolved parties will reconvene and discuss other options. Dow must not only resolve the polyol variability issue but demonstrate process capability at the new polyol volume levels." *Ibid.*

On November 26, 2003, Dow sent GE the first of ten drafts of the agreement that the parties exchanged between that date and July 23, 2004. The draft was sent as an attachment in an email written by Les King. The email contained the following caveat: "I wanted to give you a draft so that we can finalize and sign this agreement soon. This is a draft and I do not have final approval for signatures." Pl.'s Mot. Summ. J. Ex 26, Email (Nov. 26, 2003). The draft provided:

## DRAFT

Letter Agreement

When signed by the parties this "Letter Agreement" between the Dow Chemical Company, a Delaware corporation and Dow Quimica Mexico, S.A. de C.V., a corporation organized under the law of Mexico (collectively Dow) as sellers and General Electric Company, a New York corporation, acting through its GE Consumer Products business component (GECP) and Controladora Mabe AS de CV, a company organized under the laws of Mexico (Mabe) as buyers shall become the controlling agreement of the parties with respect to purchase by GECP and Mabe of PAPI* 6146, XUS 15639 polyol, DSD 296.01 polyol and DSD 358.02 polyol, which are polyurethane raw materials manufactured and sold by Dow and which are further defined below in the Current Price List (the "Products").

Effective January 1, 2004 and in exchange for the following pricing, Dow will sell and GECP and Mabe will purchase 100 percent of their requirements for the Products for GECP's Decatur and Louisville plants and Mabe's Celaya and Queretaro plants. GECP will use their best efforts to convert the Bloomington plant to the Products at the earliest opportunity and purchase 100 percent of their requirements after conversion, but no later than August 15, 2004, unless both parties

-16-

agree to any delay.  This Letter Agreement shall remain in effect through December 31, 2005 and may be extended by agreement of all parties to include 2006.

Current Price List

| | | | |
|---|---|---|---|
| PAPI* 6146 | $.725 lb (.79)[5] | DSD 296.01 | $.63lb |
| XUS 15639 | $.615 lb (.71) | DSD 358.02 | $.76 lb |

These prices are effective January 1, 2004 and shall remain firm for 2004.  Prices for Mabe shall be effective the date of Queretaro conversion if before January 1, 2004. Dow shall have the opportunity to increase or decrease the prices at the start of a calendar quarter with the intent being to keep pricing in line with the market and maintain competitive pricing, provided that Dow may not increase or decrease the price between January 1, 2005 and December 31, 2005 by more than 6 percent.  Any increase or decrease of up to 3% would be effective January 1, 2005 and the balance, if any, would be effective April 1, 2005 or a later calendar quarter.  If Bloomington conversion is delayed beyond August 15, 2004, Dow shall have the right to revert to the invoice prices that were in effect on October 15, 2003 for all purchases and shall have the right to exceed the 6 percent increase or decrease for 2006.  Dow must have the polyol variability issue resolved to GECP's satisfaction and demonstrate process capability at increased polyol levels at least three months before the Bloomington conversion.

Dow will pay a volume rebate on all pounds sold under this Agreement on a calendar year basis if all combined GECP and Mabe shipments exceed 55 million pounds in any calendar year.  Dow will pay a $.01 per pound volume rebate on all pounds shipped during that calendar year.  If total shipments exceed 70 million pounds in any calendar year, Dow will pay a $.02 per pound volume rebate (noncumulative) on all pounds shipped during that calendar year.  For 2004 only, if total shipments exceed 62 million pounds during 2004, Dow will pay a $.0125 per pound volume rebate (noncumulative) on all pounds shipped during 2004.  Dow may pay the volume rebate, at its sole discretion, if the total shipments do not reach the volume levels specified in a calendar year because of market conditions which adversely affect the GECP and Mabe business.

All rebates will be paid in the form of a credit memo good for the purchase of Dow polyurethane Products.  The credit memo will be issued within 45 days after the end of a calendar year and will be issued to GECP or Mabe entity located in the country where the Product was shipped.  All credit memos will expire within one year from date of issuance.

---

[5]Numbers in parentheses appear to be a handwritten addition.

-17-

Shipping to all U.S. plants will be paid by DOW. For the Mabe plants, Dow will pay freight to the US/Mexico border. Mabe is responsible for the freight from the border to its plant sites, with rail reimbursement by Dow as the parties are doing business currently.

Mabe Brazil and Colombia agree to start qualifications for Products during the first quarter of 2004 based on a clear understanding of the technical implications and defined resources that are agreed by both Dow and Mabe before January 31, 2004. Products shipped to Brazil and Columbia would qualify for the volume rebates, pricing to be negotiated by the parties.

Dow will continue to wok with GECP and Mabe on productivity improvement projects and help GECP and Mabe reach the 5 percent annual cost improvement goal.

The parties agree that this Letter Agreement will be governed by the laws of New York, and that any written terms of the parties pertaining to sales or purchases not contained herein (e.g., invoice, purchase order, confirmation etc.) shall be disregarded in the interpretation of this Letter Agreement and the sales and purchases of product contemplated hereunder.

*Ibid.*, Draft Agreement.

On December 2, 2003, before GE responded to the draft, a discussion between GE's management and engineers occurred about the quality of Dow's polyol. Kenneth Davis informed the company that "[f]rom the technical and operational side we have continually communicated our displeasure with Dow to its face. It has become so widespread that both LPO and BPO have joined in with their own concerns." Pl.'s Mot. Summ. J. Ex. 29, Email (Dec. 2, 2003). Davis was "frustrated with Dow's continued foul-ups." At that time, Beth Vance was hopeful that although "we still don't have a signed contract with them," it "would be done in the next few weeks" and Dow, if its polyol passed the qualification tests "would be in at BPO by 8/15/04" Pl.'s Mot. Summ. J. Ex. 28, Email (Dec. 2, 2003).

On December 3, 2003, Beth Vance communicated GE's displeasure to Dow, stating that GE first wanted to deal with the polyol quality issues before turning its attention to the draft agreement. In a email to Les King, she wrote:

> We are still looking at the agreement.  Right now however we have bigger issues that Dow needs to respond to us on why they can not execute.
>
> There are a lot of people within GE that are extremely disappointed with Dow's performance and that will not help Dow get in at BPO or at this rate stay in DPO. Listed below, I have put a few quotes I have gotten from people at GECP regarding Dow's performance in the last two weeks and this is just the tip of the iceberg:
>
> 'Technically Dow appears first rate on paper but their execution has been sorry.  I am sure you have followed the saga of polyol quality varying so much that K-factor and min fill have varied drastically in production.'
>
> 'To add insult to production problems Dow just killed a very expensive multicompany MDI/445fa foam/liner material trial after being hammered before hand several times about getting it right the first time'
>
> . . .
>
> What is Dow going to do about this?????

Pl.'s Mot.  Summ.  J.  Ex.  27, Email (Dec. 3, 2003).  On December 8, 2003, Beth Vance emailed Dow a draft of the agreement in response to Dow's draft dated November 26, 2003.  GE's draft kept the same introductory language, but omitted the .79 and .71 handwritten notations appearing next to the prices for PAPI 6146 and XUS 15639.  GE made additional changes to the remainder of Dow's proposed draft:

> These prices are effective January 1, 2004 and shall remain firm for 2004.  Prices for Mabe shall be effective the date of Queretaro conversion if before January 1, 2004. Dow and GECP shall have the opportunity to increase or decrease the prices at the start of a calendar quarter in 2005, with the intent being to keep pricing in line with the market and maintain competitive pricing.  GECP and Dow may not increase or decrease the price between January 1, 2005 and December 31, 2005 by more than 6 percent.  A 3% increase or decrease can be effective January 1, 2005 or a later calendar quarter, and the balance (3%), would be effective April 1, 2005 or a later

-19-

calendar quarter. Dow must have the polyol variability issue resolved to GECP's satisfaction and demonstrate process capablility at increased polyol levels at least three months before the Bloomington conversion. The Bloomington conversion should be completed by 8/15/04, pending polyol variability issue is resolved. If the issue is not resolved three months prior to to 8/15/04, conversion would be pushed out to 1/1/05. If polyol variability issue is not resolved to GECP's satisfaction then Bloomington will not be converted in 2004, and AP5, DPO, and Mabe will then have the 1/1/04 prices mentioned above and these prices will be in effect for all of 2004. The 2005 pricing would still have a maximum increase or decrease of 6% , with 3% effective 1/1/05 at the earliest, and the other three effective 4/1/05 or a later quarter.

Dow will pay a volume rebate on all pounds sold under this Agreement on a calendar year basis if all combined GECP and Mabe shipments under this Agreement reach certain volume levels. If total shipments exceed 55 million pounds in any calendar year, Dow will pay $.01 per pound volume rebate on all pounds shipped during that calendar year. If total shipments exceed 70 million pounds in any calendar year, Dow will pay $.02 per pound volume rebate (noncumulative) on all on pounds shipped during that calendar year. For 2004 only, if total shipments exceed 62 million pounds during 2004, Dow will pay a $.0125 per pound volume rebate (noncummulative) on all pounds shipped during 2004. Dow may pay the volume rebate, at its sole discretion, if the total shipments do not reach the volume levels specified in a calendar year because of market conditions which adversely affect the GECP and Mabe business.

All rebates will pe paid in the form of a rebate check. The rebate check will be issued within 45 days after the end of a calendar year and will be issued to GECP or Mabe entity located in the country where the Product was shipped.

Shipping to all U.S. plants will be paid by Dow. For the Mabe plants, Dow will pay freight to US/Mexico border. Mabe is responsible for the freight from the border to its plant sites, with rail reimbursement by Dow as the parties are doing business currently.

Mabe Brazil and Columbia agree to start qualifications for Products during the first quarter of 2004 based on a clear understanding of the technical implications and defined resources that are agreed by both Dow and Mabe before January 31, 2004. Products shipped to Brazil and Columbia would qualify for the volume rebates, pricing to be negotiated by the parties.

Dow will continue to work with GECP and Mabe on productivity improvement projects and help GECP and Mabe reach the 5 percent annual cost improvement goal.

> The parties agree that this Letter Agreement will be governed by the laws of New York, and that any written terms of the parties pertaining to sales or purchases not contained herein (eg., invoice, purchase order, confirmation etc.) shall be disregarded in the interpretation of this Letter Agreement and the sales and purchases of product contemplated hereunder.

Pl.'s Mot. Summ. J. Ex. 28, Draft Agreement (Dec. 8, 2003)

At this point, Dow felt that the negotiations were "not moving along because we were, you know, in circles on the same subjects, on the same issues and we didn't move from there." Pl.'s Mot. Summ. J., Barreda dep. at 139-40. Among the sticking points were the pricing terms, product quality, and Dow's belief that GE was imposing its selling terms and conditions. Both parties felt that the terms they sought in their respective drafts were deal breakers. Les King summarized the parties' positions and negotiation history as follows:

> The major disagreement is they want firm pricing for all of 2004 and the pricing caps to apply whether Bloomington is converted or not. At the November meeting in Louisville we told them everything was dependent on getting the Bloomington business and we put in a August 15, 04 deadline to revert to higher invoice pricing if Bloomington not converted.

> Their argument is they turned down the Bayer offer which included Bloomington and Celaya plants for urethanes and all plants for ABS and now they are paying Bayer a premium for Bloomington urethanes until they convert to Dow. GE believes that polyol variability is a Dow problem and Dow must fix it to their satisfaction. We are on a lot of radar screens within GE because of quality problems (polyol, MDI & 245fa trial).

> I told Beth Vance that the August 15 date was a deal breaker for Dow because we based our proposal of 70 MM lbs volume and we would not move from that position. She would not budge and said it was a deal breaker for GE if we did not provide the terms and conditions in that draft. She said it was our problem and GE should not be punished any more because of our variability problem. If not resolved to their satisfaction in time for summer conversion, then the next time period would be the end of next year. We need to discuss the polyol variability issue and decide what position we are going to take on resolving it.

Pl.'s Mot. Summ. J. Ex. 31, Email (Dec. 13, 2003).

-21-

Beth Vance testified at her deposition that in February 2004, the polyol variability was still an issue and it needed to be resolved before GE was willing to sign an agreement:

> Q.    All right. And you indicate to [GE engineers] on February 9th, 'Before we move forward on signing an agreement with Dow, just wanted to check with you guys and make sure you were okay with the information they presented on finding a solution to the polyol variability issue DPO was having.' Do you see that?
>
> A.    Yes.
>
> Q.    And is it fair to say that you found it necessary to check with them on that issue before you moved forward on signing an agreement with Dow?
>
> A.    I wanted to make sure that the polyol variability issue was resolved.
>
> Q.    Okay. And the reason you wanted to make sure of that was that you did not want to sign an agreement with Dow if the polyol variability issue was not solved, correct?
>
> A.    Correct.

Vance dep. at 258. GE engineers, however, were unwilling to give their endorsement. Ken Davis stated in an email to Vance that "[t]he only thing that will make me more comfortable is time. The longer their product remains consistent, the more comfortable I will get." Pl.'s Mot. Summ. J. Ex. 32, Email (Jan. 6, 2004). Dan Case, a foam engineer at the Decatur facility agreed that more time was needed. Pl.'s Mot. Summ. J. Ex. 33, Email (Jan. 6, 2004). On the Bloomington side, engineer Steve Merry indicated that GE did not want to commit itself to use Dow polyol at the Bloomington plant "until and unless the polyol variability issue was fixed." Merry dep. at 49.

Although Vance and the GE engineers were hesitant about the polyol quality, internally Dow felt that the issue had all but been resolved. On February 2, 2004, Reardon wrote an email to Stephanie Barbour and explained that

> The meeting went extremely well with GE. . . .   [T]he dates and the recommendations were positively received by GE. I believe that the polyol variability issue is off the table. Also, I believe that Dow greatly enhanced our credibility with GE from a technical standpoint. . . . The scope and completeness of the work left no doubt that Dow had identified the problem and was in control of the situation.

-22-

Def.'s Resp. Br. Ex. 23, Email (Feb. 2, 2004). On February 5, 2004, Les King circulated another draft of the agreement internally at Dow. In an email accompanying the draft to Reardon, King explained that "[m]ost of the changes have to do with the elimination of the polyol variability portion." Def.'s Mot. Summ. J., Ex. 25, Draft (Feb. 5, 2004).

On May 7, 2004, Beth Vance informed Dow that its polyol had finally passed a technical review, giving "the green light for Dow foam implementation." Pl.'s Mot. Summ. J. Ex. 34, Email (May 7, 2004). And on May 10, 2004, GE confirmed to Dow that GE had received an offer from a competitor for fixed pricing at is Bloomington facility. The letter stated, in pertinent part: "GE Consumer and Industrial is currently buying MDI and Polyol products from Bayer Material Science for its polyurethane application in its Bloomington Indiana production plant. GE was offered a firm price for all of calendar year 2004." Def.'s Mot. Summ. J. Ex. 28, Letter.

Thereafter, Vance made arrangements for Les King to come to Louisville. At the same time, however, Vance was operating under the belief that it would take more time to sign the agreement and thus King was not coming to Louisville to complete the deal. In an email, Vance explained to her colleagues, "Les King will be in here on Wednesday and is bringing a draft of the agreement. I am not sure we will be able to get it through Legal and signed by the end of June." Pl.'s Mot. Summ. J. Ex. 35, Email (May 7, 2004).

King visited GE on May 11, 2004 and left a draft agreement with Vance. The introductory language and price per pound remained unchanged, but otherwise the draft contained the following new language:

> Effective January 1, 2004 and in exchange for the following pricing, Dow will sell and GE Consumer & Industrial and Mabe will purchase 100 percent of their requirements for the products for GEC&I's Decatur and Louisville plants and Mabe's Celya and Queretaro plants. GEC&I will use their best efforts to covert the

-23-

Bloomington plant to the Products at the earliest opportunity and purchase 100% of their requirements after conversion, but no later than August 15, 2004, unless both parties agree to any delay.  This Letter Agreement shall remain in effect through December 31, 2005 and may be extended by agreement of all parties to include 2006.

. . .

These prices are effective January 1, 2004 and shall remain firm for 2004.  Dow shall have the right to increase or decrease the prices within thirty (30) days written notice, provided that Dow may not increase or decrease the price between January 1, 2005, and December 31, 2005 by more than 6 percent.  Any increase or decrease of up to 3% would be effective on or after January 1, 2005 and the balance, if any, would be effective not sooner than ninety (90) days later.  The parties agree to meet during the fourth quarter of 2004 to discuss the amount of the January 1, 2005 pricing action. *If Bloomington conversion is delayed beyond August 15, 2004, Dow shall have the right on all subsequent purchases to revert to the invoice prices that were in effect on October 15, 2003 for all purchases and shall have the right to increase prices with thirty (30) day written notice for the balance of the term, and increases may exceed 6 percent for 2005.*

Dow will pay a volume rebate on all pounds sold under this Agreement on a calendar year basis if all combined GEC&I and Mabe Shipments under this Agreement reach certain volume levels.  If total shipments exceed 55 million pounds in any calendar year, Dow will pay a $.01 per pound volume rebate on all pounds shipped during that calendar year.  If total shipments exceed 70 million pounds in any calendar year, Dow will pay a $.02 per pound volume rebate (noncumulative) during that calendar year.  For 2004 only, if total shipments exceed 62 million pounds during 2004, Dow will pay a $.0125 per pound volume rebate (noncumulative) on all pounds shipped during 2004.  Dow may pay the volume rebate, at its sole discretion, if the total shipments do not reach the volume levels specified in a calendar year because of market conditions which adversely affect the GEC&I and Mabe business.

All rebates will be paid in the form of a credit memo good for the purchase of Dow polyurethane products.  The credit memos will be issued within 45 days after the end of a calendar year and will be issued to GEC&I or Mabe entity located within the country where the product was shipped.  All credit memos will expire within one year from the date of issuance.

Pl.'s Mot Summ.  J. Ex.  36, Draft Agreement (emphasis added). That month, Chuck Reardon, a

member of Dow's negotiating team, made a Powerpoint presentation on Dow's efforts to secure a

GE agreement.  According to Reardon, the purpose of the presentation was to educate his superior,

Pat Dawson, "as to where we were in the negotiations." Pl.'s Resp. Br., Reardon dep. 149. The

presentation read:

### GE and Mabe Agreement

- Current Position with GE and Mabe Prior to Agreement

  | | |
  |---|---|
  | – GE Louisville | 8MM lbs |
  | – GE Decatur | 18 MM lbs |
  | – Mabe – Celaya | 16 MM lbs |
  | – DRI-NAA | <u>2 MM lbs</u> |
  | Total | 44 MM lbs |

- Competitive Position with GE and Mabe

  | | |
  |---|---|
  | – GE Bloomington (Bayer) | 14 MM lbs |
  | – Mabe Queretaro (Huntsman) | 17 MM lbs |

### Some Background

- GE was moving to a consolidated supplier position.
- GE was our only account in NAA because Dow Lost Maytag in August 2002 to Bayer – and signed a three year deal
- Huntsman and Bayer were both pursuing an expanded supply position at GE.
- Historical loss of market share from 35% less than 6 years ago to 15 % at end of 2003
- Pursuit of E'lux and Whirlpool were not advancing as we had hoped – E'lux had a 7% rebate
- Our targets for NAA Appliance was to get Bloomington and E'lux in Anderson
- Could not lose GE business in NAA
- We had been trying to get Bloomington for several years – Started in earnest down this path in early 2003
- Major hiccup with Polyol Variability issue in May of 2003

### Elements of the Deal

- Effective January 1, 2004 – December 31, 2005 With an Option for 2006 (Started negotiations in early 2003)
- 100% Supply position in NAA and Mexico – Convert Bloomington and Queretaro
- Pricing Elements

   – Current Pricing
      MDI $725          Polyol Celaya $.63/lb
      Pol yol $.615      Polyol Queretaro $76/lb
   – Firm Pricing for 2004 with 6% cap for 2005
   – Volume rebate continued from previous and paid as credit memo

   +55MM lbs – $.01/lb
   +70MM lbs – $.02/lb

Def.'s Resp. Br. Ex. 11, Presentation.

After King left the draft with Vance on May 11, 2004, GE began to discuss developments in the polyurethane market and its desire to include new language in the draft as a result. Vance testified at her deposition:

> Q. Now, Vance [exhibit] 20 is an E-mail chain concerning surcharges that were being announced in the chemical industry as they affected products that you were buying, correct?
> A. Not products I was buying directly, but products that were similar to mine.
> Q. Okay. Well, if you look at the bottom of Page 267 Vance 20, it's a May 11th E-mail from you to your bosses at the time, correct?
> A. Correct.
> Q. And you indicate there, "Well, it looks like the chemicals industry has decided to piggyback onto the steel industry's ideal of implementing surcharges. Effective May 1, BASF has decided to implement a surcharge until, quote, costs subside back to reasonable levels, close quote. This surcharge is in addition to two price increases already announced this year, and another one may be coming in July. Looks like May's surcharge for MDI is only .05 dollars per pound, and polyol surcharge for May is also five cents per pound,' correct?
> A. Correct.
> Q. Okay. And you were buying both MDI and polyol, correct?
> A. Yes.
> Q. You just weren't – you personally weren't buying it from BASF, correct?
> A. Right.
> Q. Okay. Now – so as of May 11th, you were aware that BASF was charging these surcharges, correct?
> A. That's the day Les came in and told us about it, yes.
> . . .
>
> Q. Did you discuss that with him at the time?

A.      Besides the E-mail, I don't know that we had any face-to-face conversations about it.

Q.      Did you take any steps to understand your legal standing?

A.      No.

Q.      Did you start seriously considering other supply options?

A.      No.

Q.      Okay. Then you sent an E-mail the same day to – back to Mister Kendall as well as to Mister Ramirez and Mister Willian, and they were your bosses at the time; is that right?

A.      Yes.

Q.      Okay. And you're saying in your E-mail, 'Good thing is, we don't have a signed contract with them yet. So we will try and get something in there about no surcharges.' Do you see that?

A.      Yes.

Q.      And you're referring there to Dow, correct?

A.      Correct.

Q.      And your point there is that you still have an opportunity to insert terms into the agreement that you're drafting with Dow, right?

A.      I'm just saying that we haven't signed the contract yet, so I can clarify the point that a price increase – fixed price is no surcharges.

Q.      Well, was there anything in the draft agreements that had been exchanged as of that date with respect to surcharges?

A.      No.

Vance dep. at 266-69.

Dow was also concerned about the increase in the price of raw materials. Pat Dawson wrote

in an email to Chuck Reardon:

The reality is that we are incurring un-foreseen hydrocarbon costs that are unprecedented and the industry is sold out. Their prices must go up and I am willing to challenge the contract in order to improve our financial returns. Otherwise, we will never get this business to the point where we can reinvest to expand capacity for profitable growth.

Def.'s Resp. Br. Ex. 12, Email (June 13, 2004). Les King had similar feelings; however, he was

concerned about the implications of raising prices on the finalization of the agreement. He stated:

The quality issue of the polyol variability in the U.S. and our failure to pass the chamber pressure test at Queretaro delayed the signing of our letter agreement with GE, but we have been operating under the terms and conditions of the agreement for

-27-

the past 6 months.  We now have both of the plants in Mexico and everything is progressing toward the Aug 2nd transition to Dow material in Bloomington.

GE is well aware of the raw material price increases . . . as Bob and I presented some of the slides from the Dow white paper a couple of weeks ago during our visit.  If we absolutely can not live with our agreement, then I would propose we give GE & Mabe several options and let them be part of the decision.  We could improve our overall NUR by increasing prices at selective plants on mdi or polyol or both, or we could remain firm this year and increase more than 6 % next year.  I am looking forward to our meeting to explore our alternatives at GE on Jul[y] 1st[, 2004] in Midland.

Def.'s Resp. Br. Ex. 13, Email (June 29, 2004).

On June 14, 2004, Dow sent Vance another draft, but instead of following through with Dow's request to route the document internally for signature, Vance sent Dow a revised draft the following day.  The draft was entitled "DRAFT SUPPLY AGREEMENT" and included the following relevant changes from Dow's May 11, 2004 draft.  Pl.'s Mot. Summ. J. Ex. 40, Draft Supply Agreement.  First, GE inserted the clause "Dow will manufacture these products in accordance with the specifications of GE and Mabe in all respects."  *Ibid.*  Second, as to surcharges, GE inserted "GE and Mabe will not be responsible for any surcharges on the Products throughout the Agreement term."  *Ibid.*  Third, GE required that its "standard Conditions of Purchase . . . to be issued in connection with Purchase Orders . . . shall apply to all purchases."  *Ibid.*

Dow felt the changes were akin to a blank check to GE's engineers "[b]ecause we now give [GE] the capability to determine any specification that they require, regardless of our capability to be able to meet that or not meet that and the capital that would cost or the exposure, if we could not meet that."  Pl.'s Mot Summ. J., Reardon dep. at 180-81.  Consequently, Dow rejected the draft supply agreement.  Les King summed up the company's feeling in an email dated June 17, 2004 to GE, which stated:

-28-

I was very surprised at all the changes your lawyer proposed in the Letter Agreement. Unfortunately, these changes are not in the spirit of our negotiations for the previous ten months and are not acceptable. I made the name changes that Jose Luis wanted in the attached draft that is acceptable. Jorge feels there are some legal implications to using Controladora Mabe as we invoice to Leiser and Mabe and that should be acknowledged in the Letter Agreement. The name of the invoiced company should be the correct legal name of the party that actually takes delivery of the material and is responsible for payment of the invoice.

Jorge and Jose Luis will make any needed changes to make sure it is done correctly. After those changes then we are ready to sign the agreement. I left you a voice mail message earlier when I could not reach you by phone to discuss this situation. Please call and we can discuss in greater detail.

Pl.'s Mot. Summ. J. Ex. 42, Email (June 17, 2004). King also attached to that email a revised draft of the agreement. That draft, however, was the same draft King provided GE on May 11, 2004.

On June 29, 2004, GE sent Dow another draft of the agreement. Beth Vance summarized the changes in an email to Les King:

I have looked over this one and the one I sent you. I can't see the changes you are talking about. As I stated before, most of the wording is the same – the structure is different but I don't see why that is a problem. We can change the title to letter agreement if that is a big issue. We added a surcharge statement in there under products and pricing that is one difference. Our payments are from receipt dates - not invoice date - I am not sure why this is a problem as we have been paying Dow from receipt date now for years. I left the Mabe Brazil and Columbia paragraph out as I thought you wanted to take this out. If this is an issue I can put it in. I have taken out the conditions of purchase paragraph off however I am not sure that will work with our legal. Your last paragraph I remove as well as legal does not like this.

Pl.'s Mot. Summ J. Ex. 43, Email (June 29, 2004). In addition, the draft, attached to Vance's email, to Dow's displeasure, retained the language requiring Dow to manufacture its products to GE and Mabe's specifications in all respects.

Dow sent a revised draft on July 24, 2004. Dow dramatically increased the price per pound of its products purportedly because of the increasing cost of benzene, a product used in the manufacturing of polyol. The prices changed as follows:

-29-

January 1, 2004 through August 8, 2004

| PAPI* 6146 | $.725 lb | | DSD 296.01 | $.63 lb |
|---|---|---|---|---|
| XUS 15639 | $.615 lb | | DSD 358.02 | $.76 lb |

August 9, 2004 through December 31, 2004

| PAPI* 6146 | $.825 lb | | DSD 296.01 | $.69 lb |
|---|---|---|---|---|
| XUS 15639 | $.675 lb | | DSD 358.02 | $.82 lb |

Pl.'s Mot. Summ. J. Ex. 44, Draft Agreement. Dow also reserved "the right to add a surcharge to reflect any increase in price of benzene and other raw materials." *Ibid.*

GE was not happy by the latest version and considered negotiations over. Beth Vance testified at her deposition:

Q.     On July 3rd, 2004, he's forwarding to you the revised draft letter agreement that was sent to you on July 23rd, correct?

A.     I don't think he sent me anything in July.

Q.     You received a copy from Dow that's marked as Exhibit 46 on July 23rd, correct?

A.     But not July 3rd.

Q.     I'm sorry, did I say July 3rd again? Let me repeat the question. It's getting to be a long day. On August 3rd, 2004, Mister King is attaching the revised draft letter agreement that was sent to you on July 23rd, correct?

A.     Correct.

Q.     Did you circulate this draft letter agreement that was attached as – attached to the August 3rd E-mail for circulation and signature by GE?

A.     No. It was a violation of our agreement. I don't want anybody in GE to sign something that's a violation of something we agreed to do with Dow.

Q.     As far as you were concerned, when did negotiations with Dow cease on the draft letter agreement?

A.     When Les came in on July 16th, we talked about the draft letter agreement, changes that we both wanted to see, and then he said that they couldn't live up to the agreement anymore, that they needed some price relief. And that was not agreeable to us, because we already had an agreement that said we weren't taking any price increases.

Q.     So as of July 16th, negotiations over this draft letter agreement ceased; is that correct?

A.     In my mind, yes. They came in on the 30th.

Q.     And your meeting on July 30th confirmed to you that negotiations over this letter agreement had ceased, correct?

-30-

> A.  We were talking negotiations of the pricing. They wanted a price increase,
> a big one, and we didn't want to give them a big one.

Vance dep. at 218-19.

Although in Vance's mind the negotiations had come to an end, GE felt an agreement had

nonetheless emerged.  The polyol variability issue had been resolved, GE had converted its

Bloomington plant, Dow had been supplying its polyurethane raw materials to all five GE

manufacturing plants, and the price structure reflected the pricing discussed at the October 15, 2003

meeting.  Dow had requested a commitment letter from Mabe confirming that Dow was to become

the exclusive supplier at the Queretaro facility.  On November 25, 2003, Jose Luis Lopez, a sourcing

leader at Mabe, provided the requested letter.

Further, the Queretaro plant began the process of converting to Dow products in December

2003 as contemplated by the outline King sent Dow following the October 15, 2003 meeting.  Dow

apparently switched to a fixed price arrangement shortly thereafter.  Andres Hernandez, a Dow

manager in Mexico, explained at his deposition:

> Q.  Do you know if Dow Mexico implemented price changes for Celaya and
> Queretaro consistent with the prices reflected in Exhibit 4?
> A.  Correct.
> Q.  Okay.  And did those prices become effective on the date of the Queretaro
> conversion?
> A.  Yes.
> Q.  Now, as far as the date of the Queretaro conversion, did Dow Mexico use the
> date when the conversion started or the date when the conversion ended?
> A.  When the conversion started?
> Q.  So in December of '03, that is when the new prices went into effect?
> A.  Yes.

*Id.* at 121. Ultimately, according to Hernandez, the conversion at the Queretaro plant was completed

in May 2004. *Id.* at 112-113. The process was delayed, Hernandez explained, because of the polyol

variability issue. *Id.* at 123-124.

-31-

The delay placed GE in a difficult situation, requiring it to seek materials form its former supplier and Dow competitor, Huntsman, in the interim. *Id.* at 124. Huntsman was willing to provide materials at a reduced price if Queretaro would enter into a long term agreement with it. GE informed Dow of the offer, and Dow allarently responded that it considered GE and Mabe "as strategic partners" and, GE alleges, reminded GE that it was obligated to purchase 100% of its requirements for the Queratero facility from Dow. Def.'s Mot. Summ. J. Ex. 21, Email (Mar. 26, 2004).[6] Nonetheless, Dow made a concession: it would pay the thirty percent premium – the spot market price of polyol – GE had to pay Huntsman without a long term contract. In an internal email, Hernandez explained that Dow was "delivering a message that we will help them in some way with this premium, just because we are looking them [sic] as strategic partners and because we have a three year contract." Def.'s Mot. Summ. J. Ex. 33, Email (Mar. 26, 2004). Dow followed through with the promise and paid for one-third of the cost of the polyurethane products Mabe purchased from Huntsman.

In addition to implementing fixed pricing at Queretaro, Dow also changed its pricing to a fixed arrangement at GE's Louisville and Decatur facilities. On December 29, 2003, Les King wrote an email to Beth Vance to inform her that

> [w]e believe that the polyol variability issue is a separate issue from the BPO conversion and pricing issue and would like to treat them as two separate events. We have a very high confidence level on solving the polyol variability situation. I will call you on Jan 5th after the holidays to discuss how best to move forward with our agreement. We have made the changes necessary to invoice all shipments effective 1/1/04 at $.725/lb for Papi 6146 and $.615/lb for XUS 15639 as we also believe that we get this agreement signed during Jan.

---

[6] The text of the email is adopted from GE's brief, but it was written in Spanish and neither party has furnished the Court with a translation.

Def's Mot. Summ. J. Ex. 23, Email (Dec. 29, 2003). This change, however, appears to be in response to an email by Beth Vance informing King that "I will be changing the PO's [Purchase Orders] with the new prices for AP5 and DPO effective 1/1/04" and under "the assumption that we will get this agreement signed and BPO converted over in August 2004." *Ibid.* According to GE, the change to fixed pricing signaled the "point of no return." Def.'s Mot. Summ. J. Ex. 40, Email (Jan. 7, 2004). Ramirez wrote:

> Excellent.
>
> Mike & Mike: we are at the point of no return. BPO has been converted to Dow, we took a price increase from Bayer so the sooner we can make it happen the better.

*Ibid.*

Both before and after the fixed prices were implemented, GE paid according to Dow's standard payment terms. Further, Dow confirmed that it would pay rebates in the amount of $162,532 on the products it sold to GE for the period of time between January 1, 2004 and May 31, 2004 if GE's consumption continued at the current pace in line with the discussions in the outline prepared by Les King following the October 15, 2003 meeting. In a letter dated June 9, 2004 to Beth Vance, King wrote:

> Per your request, I am writing to confirm rebates due GE Appliances from The Dow Chemical Company for purchases of MDI and polyol made January 1, 2004 through May 31, 2004 for AP5 and the Decatur plant operations. Though both parties continue to work toward a final contractual agreement, we recognize that purchases have been made in good faith and these rebates have been earned for this period of time. Therefore, a credit of $162,532 will be issued to GE Appliances for rebates earned on purchase made by GE from January 1, 2004 through May 31, 2004. This rebate will be issued in January 2005 in the form of a credit memo for the purchase in the above time period plus a rebate on all pounds of MDI and polyol purchase during the remainder of the calendar year 2004. This rebate is contingent upon GE purchasing a certain volume level during the calendar year.

-33-

Def.'s Mot. Summ. J. Ex. 29, Letter (June 9, 2004).  Although Dow confirmed it would pay the

rebates, King's letter came after a request from Beth Vance.  The letter itself was actually prepared

by Vance, and in an accompanying email to King she explained

> Attached is a letter I need you to fill in if possible so we can accrue our rebates for
> Dow through 5/31/04 as we talked about on your last visit here.  You had mentioned
> that this shouldn't be a problem and I need to get this closed by 6/11/04.  If you
> could put it on Dow letterhead and fax it to me that would be great.

Pl.'s Resp Br. Ex. 7, Email (June 9, 2004).

Finally, as requested by Dow in the drafts of the agreement exchanged, GE converted its

operations at Bloomington for the supply of polyurethane materials by Dow.  King explained at his

deposition that although the negotiations were ongoing and in his mind proved unsuccessful, the

Bloomington facility "did get converted." Def.'s Mot.  Summ.  J.  Ex.  2, King dep. at 200.  GE

engineers explained the process of converting a plant:

> Q.    Are you familiar with the term conversion used in the context of a
>       refrigeration refrigerator plant changing from one supplier of polyol and
>       isocyanate to another?
> A.    Yes, I'm familiar with it.
> Q.    Is there a difference between qualification of a supplier's polyol and
>       isocyanate conversion with respect to those two materials?
> A.    Yes, there is a difference.
> Q.    What's the difference between things, that is the qualification and conversion
>       in the context of the supply of polyol and isocyanate?
> A.    Qualification is the process of determining acceptability of product
>       performance with the polyol and isocyanate. Conversion is actually changing
>       the plant to produce refrigerators using the polyol and isocyanate that was
>       qualified.
> Q.    So then qualification comes before conversion; is that right?
> A.    That is correct.

Pl.'s Resp. Br., Davis dep. at 54-55.  In this case, the process took a week.

Based on all of this, Les King acknowledged at his deposition that Dow had in fact realized most, if not all, of the benefits of the emerging supply agreement contained in the various drafts exchanged between the parties.  Def.'s Resp. Br. Ex 4, King dep. at 177.

In July 2004, the parties reached an impasse.  On October 7, 2004, Dow filed a complaint seeking declaratory relief pursuant to 28 U.S.C. § 2201 and asking the Court to declare that it is not obligated to sell certain polyurethane materials to GE in 2005 and beyond and that there is no contract between the parties beyond the letter agreement signed in 2002 that expired in 2004.  On November 8, 2004, GE filed its answer, affirmative defenses, and a three-count counterclaim.  GE later was permitted to amend its counter-claim, which has grown to eight counts.  To date, Dow continues to supply GE with polyol and MDI, and has expressed its intent to continue to do so until the present controversy is resolved by the Court or the parties themselves.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  The parties have filed cross-motions for summary judgment, and neither suggests that there are primary facts in dispute.  Nonetheless, the Court must apply the well-recognized standards when deciding cross-motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003).  Thus, when this Court evaluates cross-motions for summary judgment, it "must evaluate

-35-

each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506-07 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148  (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

In this case, the parties do not seriously contest the sequence of events or the substance of the written and oral dialog among their respective representatives. They vigorously dispute, however, the inferences that may and ought to be drawn from those facts. In viewing the claims from the perspective of both claimants, the Court is mindful of the rule that the party who bears the burden of proof must present a fact question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936

-36-

F.2d 889, 895 (6th Cir. 1991).  It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A.

For purposes of their cross motions, the parties concede that Michigan law is applicable to determining this dispute. The purported contract in this case is one for the sale of goods, and as such is governed by Michigan's version of the Uniform Commercial Code (UCC).  *See* Mich. Comp. Laws § 440.2201, *et seq.*

As a threshold matter, however, the Court will address Dow's affirmative defense to GE's counter-claim that the statute of frauds bars its contract enforcement claim, and GE's arguments based on promissory and equitable estoppel and unilateral contract.

Dow claims that any agreement did not comply with the applicable statute of frauds.  This defense assumes, as it must, that there was an agreement: if there was no contract, then there is nothing against which the statute of frauds protects.  If there is a contract, however, the statute of frauds is easily satisfied in this case.

Michigan's statute of frauds reads:

(1) Except as otherwise provided in this section, a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.
(2) Between merchants, if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against the party unless written notice of objection to its contents is given within 10 days after it is received.

-37-

(3) A contract that does not satisfy the requirements of subsection (1) but is valid in other respects is enforceable in any of the following circumstances:
(a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances that reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.
(b) If the party against whom enforcement is sought admits in his or her pleading or testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this section beyond the quantity of goods admitted.
(c) With respect to goods for which payment has been made and accepted or that have been received and accepted under section 2606.

Mich. Comp. Laws § 440.2201. Here, GE seeks to enforce the contract on the basis of exchanged emails and conduct in conformance with the terms of an October 20, 2003 written outline. Pl.'s Mot. Summ. J. Ex. 24, Email (Oct. 20, 2003). If a contract is formed on this basis, then the statute of frauds is satisfied because an email generally is considered a sufficient signed writing. *See, e.g. Michigan Regional Council of Carpenters v. New Century Bancorp, Inc.*, 99 Fed. Appx. 15, 22 (6th Cir. 2004) (unpublished) ( noting that "Carleton and Mitseff's attorney informed the other parties via email that the agreement was 'acceptable,'" and concluding that a "writing" therefore resulted); *Lamble v. Mattel, Inc.*, 394 F.3d 1355, 1361 (Fed. Cir. 2005).

Further, as the comments to section 440.2201 explain, "[t]he required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated." Mich. Comp. Law § 440.2201 cmt 1. In fact, the comments explain, "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." *Ibid.* Here, Dow ultimately did provide polyurethane materials to GE's plants in Queretaro, Mexico, and Bloomington, Indiana, the subject matter of the several exchanged emails. Def.'s Mot. Summ. J. Ex. 19, Hernandez dep. at 121 (noting price changes were implemented at Queretaro in line as reflected in the parties' emails); Def.'s Resp. Br. Ex 4, King dep. at 177 (noting

-38-

that Dow received its demands as outlined in the October 20, 2003 email). Therefore, *if* a contract was made in this case, the statute of frauds would not bar its enforcement.

GE claims that even if a contract was not formed, it is nonetheless entitled to relief by operation of the doctrines of equitable and promissory estoppel. The Court disagrees.

In Michigan, the doctrine of promissory estoppel arises (1) when there is a promise; (2) that the promissor reasonably should have expected would induce action of a definite and substantial character on the part of the promissee; (3) which in fact produced reliance or forbearance of that nature; (4) in circumstances such that the promise must be enforced if injustice is to be avoided. *Joerger v. Gordon Food Service*, Inc, 224 Mich.App 167, 173, 568 N.W.2d 365, 370 (1997).

Under Michigan law, "[e]quitable estoppel is not an independent cause of action, but instead a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact." *ConAgra v. Farmers State Bank*, 237 Mich. App 109, 140-141, 602 N.W.2d 390, 405 (1999). The doctrine of equitable estoppel applies when "(1) a party intentionally or negligently causes another party to believe facts through its representations, admissions, or silence, (2) the other party acts on the belief in justifiable reliance, and (3) the other party will suffer prejudice if the first party is permitted to deny the facts." *West American Ins Co v. Meridian Mut Ins Co*, 230 Mich. App 305, 310, 583 N.W.2d 548, 550 (1998). "Silence or inaction may form the basis for an equitable estoppel only where the silent party had a duty or obligation to speak or take action." *Ibid.*

Here, although the facts may establish a promise or representation – one of the essential elements of either estoppel claim – GE will not be able to prove justifiable reliance because the representations Dow made indicated that the agreement was in serious peril and the several

exchanges of drafts appeared not to satisfy GE's wishes.  Those substantial disagreements are discussed more fully below. However, it is plain that GE made its choices under changing circumstances and uncertainty.  It chose to change its position – give up other suppliers and convert its plants – not in reliance on Dow's representations but in the hope that it would reap the full benefit of a signed agreement.  The undisputed evidence demonstrates that GE knew of the possibility that an agreement would not emerge, and it cannot claim now that it relied on Dow's representations when those representations conflicted with GE's own expectations.

GE also claims that the facts support a unilateral contract.  The emails that it exchanged with Dow, GE insists, can be viewed as an invitation to enter into a unilateral contract, which GE accepted by converting its plants at Queretaro and Bloomington to Dow products.

This argument, not mentioned in its pleadings, appears to be based on a misunderstanding of a unilateral contract.  As professor Corbin has explained, a unilateral contract "consists of a promise or group of a promises made by one of the parties only." Corbin on Contracts § 1.23.  In fact, "in the case of a unilateral contract, there is only one promisor" and "the legal result is that the promisor is the only party who is under an enforceable legal duty." *Ibid.*

This case presents the quintessential promise-for-a promise contract pattern: Dow allegedly promised to sell polyurethane materials at a fixed price into the future in return for GE's promise to buy 100 percent of its requirements of them.  Although conversion of its plants was necessary for the sale, Dow never sought conversion of the plants alone.  Rather, it sought the ability to exact a payment for GE's purchase of Dow's products at its plants.  The facts do not support a claim based on a  unilateral contract theory.

B.

As mentioned earlier, the parties agree that Michigan's version of the UCC applies in this case. In Michigan, the UCC "is to be liberally construed and applied to promote its underlying purposes and policies." *Power Press Sales Co v. MSI Battle Creek Stamping*, 238 Mich. App 173, 180, 604 N.W.2d 772, 779 (1999). Since the purpose of the Code is "to make uniform the law among the various jurisdictions," it is appropriate for courts applying Michigan law, "to seek guidance [from other jurisdictions] when interpreting provisions of the UCC." *Ibid.* Further, principles of law and equity supplement individual UCC provisions, and "in the absence of directly controlling UCC provisions, questions are resolved according to general legal principles, i.e., the law of contract interpretation." *Conagra, Inc v. Farmers State Bank*, 237 Mich. App 109, 131-132, 602 N.W.2d 390, 410 (1999).

Under Michigan law, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Mich. Comp. Laws § 440.2204(1). Although the precise moment at which a contract is formed may be difficult to ascertain, "a contract for sale may be found even though the moment of its making is undetermined." Mich. Comp. Laws § 440.2204(3). Similarly, if terms "are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Mich. Comp. Laws § 440.2204(3).

The broad language of the Michigan statute contemplates contract formation in a variety of circumstances. In interpreting section 440.2204 and the UCC, Michigan and other courts have found the exchange of documents and now email can give rise to an enforceable agreement. *See Mich.*

-41-

*Regional Council of Carpenters*, 99 Fed. Appx. at 22 (enforcing a settlement agreement that was accepted by an email); *Lamble*, 394 F.3d at 1361; *Cloud v. Hasbro, Inc.*, 314 F.3d 289 (7th Cir. 2002); *Clark v. Coats & Suits Unlimited*, 135 Mich. App. 87, 98, 352 N.W.2d 349, 354 (1984). Similarly, as referenced in the statute, conduct may also give rise to the formation of a contract. The commentary to section 440.2204 explains that "in many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made." Mich. Comp. Laws § 440.2204 cmt. 7. Moreover, section 440.2204 is premised on "the assumption that businessmen frequently reach . . . understandings not instantly reduced to writing and signed." *American Parts Co. v. Am. Arbitration Assoc.,* 8 Mich. App. 156, 167, 154 N.W.2d 5, 12, (1968). The policy "is that parties should be able to enforce their agreement, whatever it is, despite discrepancies between the [initial] agreement and the confirmation if enforcement can be granted without requiring either party to be bound to a term to which he has not agreed." *Ibid.*

Although Michigan law recognizes that enforceable agreements may arise out of the exchange of email or conduct, such agreements must adhere to the basic elements of contract formation. In other words, under both statutory and common law, a valid contract presupposes mutual assent on all essential terms. *Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich. App. 543, 548-549, 487 N.W.2d 499 (1992). As a general rule, discussions and negotiations alone are insufficient to satisfy the elements of a contract. *Id.* at 549, 487 N.W.2d at 499. A contract cannot be formed without an actual offer and acceptance. *Pakideh v. Franklin Commercial Mortgage Group, Inc.*, 213 Mich. App. 636, 640, 540 N.W.2d 777 (1995). In a contract for the sale of goods, offer and acceptance have statutory descriptions:

(1) Unless otherwise unambiguously indicated by the language or circumstances

-42-

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

(b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods, but such a shipment of nonconforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

(2) Where the beginning of a requested performance is a reasonable mode of acceptance an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed before acceptance.

Mich. Comp. Laws § 440.2206. The party claiming the existence of a contract bears the burden of proving its existence. *O'Connor v. Bamm*, 335 Mich. 438, 442, 56 N.W.2d 250, 252 (1953).

The Michigan Supreme Court has instructed that the test in determining whether a contract has been formed is an objective one: there must be an "overt expression" of assent to an offer, focusing on how the words and conduct of the promissor might appear to "a reasonable person in the position of the promisee." *Rood v. General Dynamics Corp.*, 444 Mich. 107, 119, 507 N.W.2d 591, 598 (1993).

Dow argues that the Court cannot find that an enforceable agreement exists between the parties based on the exchanges of drafts via email because they demonstrate that the parties failed to reach consensus on the material terms. GE maintains that although several drafts were exchanged the material terms remained the same throughout each. However, the emails and the parties' discussions surrounding the several drafts demonstrate that several key terms remained open over the ten-month course of negotiations.

The negotiations started on September 11, 2003 with an email from Les King to Beth Vance. The email proposed three options for a new letter agreement: "status quo," status quo plus one new plant, and status quo plus two additional plants. Pl.'s Mot. Summ. J. Ex. 20, Email (Sept. 11,

-43-

2003).  Vance responded that the third option was the best, but that agreement would have to incorporate the changes including price, rebates, solving the polyol variability problem, and payment terms.  At the outset, then, there were issues as to the duration of the agreement, the amount of annual price increases, rebates on volumes to be purchased by GE, and the quality of Dow products among others.

Thereafter, the parties met at arms length on October 15, 2003, ostensibly to reach consensus on the agreement.  An October 20, 2003 outline authored by King and sent to GE by email emerged from the discussions.  However, the email concluded with the statement: "I will draft a new letter agreement once I have agreement from everyone as to the above outline we agreed to on Oct 15th." Pl.'s Mot. Summ. J. Ex. 24, Email (Oct. 20, 2003).  Although GE maintains that this draft was the ultimate expression of the material terms of the agreement, King indicated above that only after he obtained agreement, presumably from his superiors, that the outline would become final.

The finality of the agreement, GE insists, was underscored by King's deposition testimony that at the time he sent the email, his superiors had not indicated to him that he should not have used "agreement" in the subject line and the phrase "[b]elow is our understanding of pricing and conditions we agreed on new 100% supply position with GE/Mabe during our Oct 15 meeting." Def.'s Resp. Br. Ex. 4, King dep. at 167-68.  Moreover, internally, Dow felt that an agreement had been reached after the face-to-face meeting according to an email exchange between Chuck Reardon and Stephanie Barbour of Dow.  Def.'s Resp. Br.  Ex.  8, Email (Oct. 16, 2003).

However, despite what GE terms Dow's internal celebration, Vance was not willing to accept the terms of the outline proposal outright.  Vance informed King "that we agree with understanding that the 6% price cap for 2005 is price up or price down, " but "if one of the parties feels a price

increase or decrease is justified in 2005, they must bring the data that supports the increase or decrease . . . and negotiate with the other party on what the justified increase/decrease should be percentage wise."  Pl.'s Mot.  Summ. J. Ex.  25, Email (Nov. 8, 2003).  Vance also wrote "Dow to resolve polyol variability issue to GECP's okay and any other quality or delivery issue that occurs at least three months before the implementation of BPO.  If issue is not resolved parties will reconvene and discuss other options."  *Ibid.*  Consensus therefore was absent on the issue of Dow's ability to implement price changes in subsequent contract years, and GE felt so strongly about the quality of Dow's products that if the polyol variability continued GE wanted to discuss "other options."

The first actual written draft of the letter agreement was sent on November 26, 2003 in an email from Dow to GE.  The email contained the following caveat from Les King: "I wanted to give you a draft so that we can finalize and sign this agreement soon.  This is a draft and I do not have final approval for signatures." Pl.'s Mot.  Summ.  J.  Ex 26, Email (Nov. 26, 2003).

After the draft was sent, the quality of Dow's products became the topic of internal GE conversations between management and engineers, which can be characterized as discouraging if not disparaging.  By December 2003, Vance had become so frustrated with Dow's product quality that GE was unwilling to focus on the draft Dow had sent.  Pl.'s Mot.  Summ.  J.  Ex.  27, Email (Dec. 3, 2003) (noting that "[w]e are still looking at the agreement.  Right now however we have bigger issues that Dow needs to respond to us on why the can not execute").

On December 8, 2003, Beth Vance emailed Dow a draft of the agreement in response to Dow's draft dated November 26, 2003.  GE's draft kept the same introductory language, but made several changes that primarily focused on rebates and quality issues.  The changes made Dow

-45-

unhappy.  Read together, the two drafts reflect significant differences over who would be able to increase the price of polyurethane in subsequent contract years – Dow sought exclusive control in its draft, and GE sought to condition any price increase on its approval.  In Dow's draft, it retained the right to revert to higher prices if GE did not convert its Bloomington plant by a date certain despite any issue over product quality. Further, GE's draft indicated that Dow would have to resolve polyol variability problems to "GE's satisfaction." Finally, it appears GE wanted to pay on its standard terms, instead of Dow's.

In fact, both parties felt that the terms they sought in their respective drafts were "deal breakers."  In February 2004, the polyol issue was still a subject of major concern to GE and threatened the entire agreement.  GE engineer Ken Davis stated that "[t]he only thing that will make me more comfortable is time.  The longer their product remains consistent, the more comfortable I will get."  Pl.'s Mot. Summ. J. Ex. 32, Email (Feb 6, 2004).  There was similar discomfort expressed by engineers at Decatur and Bloomington as well.

Internally, Dow felt the polyol issue had been resolved as early as February 2, 2004.  On February 5, 2005, Les King circulated another draft of the agreement internally at Dow that eliminated the language concerning polyol quality.  It was not until May that GE agreed that the variability issue was off the table and Vance informed Dow that its polyol had finally passed a technical review, giving "the green light for Dow foam implementation." Pl.'s Mot.  Summ. J.  Ex. 34, Email (May 8, 2004).

With the variability issue solved, GE felt negotiations could resume, and Vance made arrangements for Les King to come to Louisville.  *Ibid.*  At the same time, however, Vance was operating under the belief that it would take more time to sign the agreement and thus King was not

-46-

coming to Louisville to complete the deal.  In an email, Vance explained to her colleagues "Les King will be in here on Wednesday and is bringing a draft of the agreement. I am not sure we will be able to get it through Legal and signed by the end of June." Pl.'s Mot.  Summ. J.  Ex.  35, Email (May 7, 2004).

King visited and left Vance with yet another draft.  The draft, however, took a hard line with respect to price increases despite the resolution of the polyol problem.  After King left the draft, GE apparently was happy that no formal agreement yet existed largely because of market changes in the polyurethane industry, according to Vance's deposition testimony.  *See* Pl.'s Mot.  Summ. J. Vance dep. at 266-69 (noting: "Q.  Okay. And you're saying in your E-mail, 'Good thing is, we don't have a signed contract with them yet. So we will try and get something in there about no surcharges.' Do you see that? A.  Yes.  Q.  And you're referring there to Dow, correct?  A.  Correct").

Internally, Dow was concerned about pricing because of "un-foreseen hydrocarbon costs that are unprecedented."  Def.'s Resp. Br. Ex. 12, Email (June 13, 2004).  Les King had similar feelings, but he was concerned about the implications of raising prices on the finalization of the agreement. Def.'s Resp. Br. Ex. 13,  Email (June 29, 2004).  In an apparent effort to protect against rising raw material prices, Dow sent GE another draft of the agreement and requested that GE fast track it for approval.  The draft did not meet with approval; instead GE sent its own draft of the agreement, entitled "DRAFT SUPPLY AGREEMENT."  Pl.'s Mot. Summ. J. Ex.  40, Draft Supply Agreement. The draft included the following relevant changes from Dow's May 11, 2004 draft: first, GE inserted the clause "Dow will manufacture these products in accordance with the specifications of GE and Mabe in all respects," *ibid.*; second, in regard to surcharges, GE inserted "GE and Mabe will not be responsible for any surcharges on the Products throughout the Agreement term," *ibid.*; third, GE

-47-

required "GE's standard Conditions of Purchase . . . to be issued in connection with Purchase Orders . . . shall apply to all purchases." *Ibid.*

There was no consensus on key terms: pricing and product specifications. Dow was concerned with committing to allow GE to determine specifications in its sole discretion, and it rejected the draft supply agreement, summing up the company's feeling in an email dated June 17, 2004 to GE:

> I was very surprised at all the changes your lawyer proposed in the Letter Agreement.  Unfortunately, these changes are not in the spirit of our negotiations for the previous ten months and are not acceptable.

Pl.'s Mot. Summ. J. Ex. 42, Email (June 17, 2003).  Attached to that email was another draft. That draft, however, was the same draft King provided GE on May 11, 2004.

On June 29, 2004, GE responded with still another draft.  GE's draft retained, to Dow's displeasure, the language requiring Dow to manufacture its products to GE and Mabe's specifications in all respects.

Dow sent a revised draft on July 24, 2004, which dramatically increased the price per pound of its products purportedly because of the increasing cost of benzene, a product used in the manufacturing of polyol.  Dow also reserved "the right to add a surcharge to reflect any increase in price of benzene and other raw materials."  Pl.'s Mot. Summ. J. Ex. 44, Draft Agreement.  GE's response was displeasure and a feeling that the negotiations were over.

In the end, based on the parties' negotiations, statements, and internal communications, it appears a consensus on key terms never emerged.  From the outset, there were issues of product quality, duration, and pricing.  It is true that at times, both parties felt and admitted that an agreement had been reached.  However, the various responses to the email and draft agreements exchanged

-48-

represent a series of offers and counter offers at best. Under Michigan law, the Court looks to the totality of the objective evidence. *See Rood*, 444 Mich. at 119, 507 N.W.2d at 598. GE claims that the material terms never significantly differed after October 2003. This argument, however, does not withstand scrutiny. The negotiations were tainted by the polyol variability issue, which nearly caused GE to end its relationship with Dow. Even after the polyol problem was resolved, the negotiations were overshadowed by pricing concerns. Market realities such as the increasing cost of benzine and other raw materials meant Dow wanted to condition the agreement on its ability to impose price increases – a feature of the drafts that never reached consensus even in the early negotiations – and GE was grateful that no agreement had been signed. GE wanted to avoid Dow passing the increased cost to it. Based on the emails, drafts, and surrounding comments alone, no reasonable fact finder would find the existence of a contract.

However, a fact issue remains in this case is because Dow appears to have performed in at least a limited manner in accordance with the terms of the October 20, 2003 outline. As noted, conduct can give rise to an enforceable agreement. *See* Mich. Comp. Laws § 440.2204(1) (stating that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract"). Although the precise moment at which a contract is formed may be difficult to ascertain, "a contract for sale may be found even though the moment of its making is undetermined." Mich. Comp. Laws § 440.2204(3). Similarly, if terms "are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Mich. Comp. Laws § 440.2204(3).

In this case, Dow admits that it received the benefits the agreement as outlined by the October 20, 2003 proposal. For example, Dow had requested a commitment letter Mabe confirming that Dow was to become the exclusive supplier at the Queretaro facility. On November 25, 2003, Jose Luis Lopez, a sourcing leader at Mabe, provided the requested letter. Further, the Queretaro plant began the process of converting to Dow products in December 2003 as contemplated by the outline King sent Dow following the October 15, 2003 meeting. Dow apparently switched to a fixed price arrangement shortly thereafter. When the conversion process was delayed at Queretaro because of Dow's product quality, Dow subsidized GE's purchases of polyol from a rival company, Huntsman. Dow stated that it considered GE and Mabe "as strategic partners" and paid the thirty percent premium – the spot market price of polyol – GE had to pay Huntsman without a long term contract. Barreda dep. at 167.

In addition to implementing fixed pricing at Queretaro, Dow also changed its pricing to a fixed arrangement at GE's Louisville and Decatur facilities. Both before and after the fixed prices were implemented, GE paid according to Dow's standard payment terms.

Finally, as requested by Dow in the drafts of the agreement exchanged, GE converted its operations at Bloomington for the supply of polyurethane materials by Dow. King explained at his deposition that although the negotiations were on going and in his mind proved unsuccessful, the Bloomington facility "did get converted." Def.'s Mot. Summ. J. Ex. 2, King dep. at 200.

Dow insists that despite the above evidence, there could be no agreement in this case absent a written document signed by all responsible parties. It is evident that under Michigan law, a binding oral contract may exist even though the parties intend to reduce their agreement to a fully executed document. However, if the parties intend to signal their agreement only by the execution

-50-

of a written document and do not intend to be bound unless and until all parties sign, no amount of

negotiation or oral agreement, no matter how specific, will result in the formation of a binding

contract. *See Michigan Broadcasting Co. v. Shawd*, 352 Mich. 453, 456-57, 90 N.W.2d 451, 453

(1958) (stating that "'[i]f the parties indicate that the expected document is to be a mere "memorial"

of operative facts already existing, its nonexistence does not prevent those facts from having their

normal legal operation. . . .  If the parties indicate that the expected document is to be the exclusive

operative consummation of the negotiation, their preceding communications will not be operative

as offer or acceptance") (quoting Restatement, *Contracts*, § 26, pp. 33, 34).  The court identified the

following factors to consider in determining the parties' intention to require a written document:

> Whether the contract is of that class which are usually found to be in writing;
> whether it is of such nature as to need a formal writing for its full expression;
> whether it has few or many details; whether the amount involved is large or small;
> whether it is a common or unusual contract; whether the negotiations themselves
> indicate that a written draft is contemplated as a final conclusion of the negotiations.
> If a written draft is proposed, suggested, or referred to during the negotiations, it is
> some evidence that the parties intended it to be the final closing of the contract.

*Id.* at 456, 90 N.W.2d at 453 (quoting *McConnell v. Harrell & Nicholson Co.*, 183 Mich. 369, 373,

374, 149 N.W. 1042, 1043 (1914)).

As to whether a contract exists, in considering the parties' presentations under Rule 56, the

Court's task is to determine if the evidence irrefutably establishes that the basic elements of a

contract – offer, acceptance, consideration – can or cannot be shown as a matter of law by the facts

that have emerged.  The issues framed by the parties (and the evidence) is whether the parties

reached mutual assent on the critical elements of product, price, and duration.  Dow claims that

neither it nor GE  intended to finalize a contract absent a written agreement, and since it is

undisputed that no written agreement was signed by the parties, it must prevail as a matter of law.

-51-

GE counters with the argument that the parties did not limit their agreement to written form only, and the conduct of the parties proves that they reached a meeting of the minds at their October 15, 2003 meeting.

"In contract actions, summary judgment may be appropriate when the documents and/or evidence underlying the contract are undisputed and there is no question as to intent. . . . Normally, however, disputed issues of contractual intent are considered to be factual issues which preclude an award of summary judgment." *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 179 (6th Cir. 1996) (citation omitted); *see also P.F. Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987). In fact, the *Shawd* court underscored this proposition when, after quoting language setting forth the factors used to determine if the parties intended to be bound only by a written agreement, it noted, "Citing the case from which this quotation was so adopted (*Mississippi & D. S. S. Co., v. Swift*, 86 Me. 248, 29 A. 1063, 41 Am. St. Rep. 545 [1894]), Williston qualifiedly concludes that 'the ultimate question is one of fact as to the intention of the parties' (1 Williston on Contracts, 3d ed., § 28, p. 68)." *Shawd*, 352 Mich. at 456 n.1, 90 N.W.2d at 453 n.1.

On the question of whether the parties intended for their agreement to take effect only on the execution of a writing, the Court finds that disputed fact issues preclude summary judgment. There is no evidence in this case as to whether the supply agreement is of "that class" usually found to be in writing, although the parties' history suggest such a practice. The agreement has "many details," and it involves large amounts of product and money. Supply contracts are common in the industry, but the negotiations included expressions of an expectation that a written document would result. Nonetheless, there was performance by the parties before "the final closing of the contract," if

"closing" was intended to be the actual signing. Although the factors set forth in *Shawd* favor a finding of an intent, the undisputed evidence does not *require* that finding.

Dow has cited cases in which courts have found no contract absent a written document when negotiations stalled. However, most of the cases cited reached that result after a trial, where a factual finding of the parties' intent properly could be made. *See PCS Sales (USA), Inc. v. Nitrochem Distribution LTD.*, 2004 WL 944541 (S.D.N.Y. May 3, 2004) (granting declaratory judgment following bench trial); *Herm HugHerm Hughes & Sons, Inc. v. Quintek,* 834 P.2d 582 (1992) (affirming trial court's ruling at trial that no contract was formed); *Shawd*, 352 Mich. at 453, 90 N.W.2d at 451(affirming chancellor's finding of no contract following a trial). Although under certain circumstances a contract will only emerge once a writing is signed based on a party's express statements, *see Continental Labs., Inc. v. Scott Paper Co.*, 759 F. Supp. 538, 540 (S.D. Iowa 1990), the party's conduct must accord with those statements. The Court finds that a fact issue exists as to whether Dow's performance indicated its willingness to proceed absent a single, signed writing. Moreover, GE proffers evidence that Dow proceeded with other companies absent a single, signed writing. *See* Def.'s Resp. Br. Ex. 4, King dep. at 73-75. Dow's claims that a written agreement was likely would not preclude a fact finder from determining the existence of a contract.

Ultimately, although facially the exchange of emails and drafts coupled with the parties' commentary does not support a contract in this case, the fact that Dow did comply at least to some degree with the October 20, 2003 outline proposal precludes the grant of summary judgment in its favor. Likewise, although GE proffers sufficient evidence that, if believed, would preclude summary judgment against it, that evidence does not conclusively establish the existence of a contract by conduct in conformance with October 20, 2003 outline proposal. Dow has adduced

sufficient evidence to require a fact finder to determine whether Dow's performance was an interim arrangement premised on the successful conclusion of negotiations.

III.

The Court has carefully reviewed the parties' submissions and concludes that there is no merit to GE's claims based on promissory estoppel, equitable estoppel, or unilateral contract. Those claims will be dismissed. Likewise, the Court determines that Dow's affirmative defense based on the statute of frauds lacks merit and will be dismissed. Fact issues preclude summary judgment for either party on the remaining claims.

Accordingly, it is **ORDERED** that the cross-motions for summary judgment [dkt #s 38, 41] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Count VI (promissory estoppel and equitable estoppel) of GE's amended counterclaim is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Dow's affirmative defense number 5 (statute of frauds) is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that further proceedings shall be governed by the Supplemental Case Management and Scheduling Order entered today.

It is further **ORDERED** that GE's *ex parte* motion to file a twenty-seven page brief in support of its motion for summary judgment [dkt # 37] is **GRANTED**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 4, 2005

-54-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 4, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS